IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | **MAR 1 3 2025** |
| | ) | Ronald E. Dowling, Clerk of Court |
| v. | ) | By_____ |
| | ) | Deputy Clerk |
| JACOB LOGAN STONE | ) | Case No. 2:09CR20074 |
| Defendant | ) | |

**MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE**

COMES NOW the Defendant, Jacob Logan Stone, pro se, and respectfully moves this Honorable Court for an Order granting early termination of supervised release pursuant to 18 U.S.C. § 3583(e)(1). In support of this motion, the Defendant states as follows:

**I. BACKGROUND**

On December 9, 2009, Stone was charged in a fifteen-count indictment with two counts of distribution of child pornography and thirteen counts of receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). On February 4, 2010, the Defendant pled guilty to one count of distribution of child pornography. The remaining counts were dismissed. He was initially sentenced to 150 months of imprisonment and lifetime supervised release.

On June 23, 2020, the Defendant was granted a reduction in sentence based on his compassionate release motion and was released from custody the same day, at which time he began serving his term of supervised release. Notably, the Defendant was the only individual in the entire district to receive compassionate release due to COVID-19, as documented in the U.S. Sentencing Commission's 2022 report

on compassionate release[1]. This distinction underscores the exceptional circumstances and unique considerations of Defendant's case. Since his release, he has completed over four years of supervised release without any violations.

Additionally, Defendant has fully paid all court-ordered fines and fees associated with this case—having satisfied these obligations nearly a decade ago while still incarcerated. This early payment demonstrates Defendant's long-standing commitment to taking responsibility and fulfilling all court-imposed obligations.

Furthermore, the U.S. Probation Office does not oppose Defendant's request for early termination of supervised release, though they do not specifically recommend it either. While probation officers are well-positioned to evaluate Defendant's progress, their neutral stance reflects neither support for nor objection to continued supervision. Defendant has fully complied with all conditions of supervision for over four years, successfully completed all required treatment, and reintegrated into society. Given the Probation Office's lack of opposition, the Court may independently determine whether ongoing supervision is necessary.

## II. LEGAL STANDARD

Pursuant to 18 U.S.C. § 3583(e)(1), the Court has discretion to terminate a term of supervised release after one year if such action is warranted by the conduct of the defendant and the interest of justice. When making this determination, Congress explicitly omitted 18 U.S.C. § 3553(a)(2)(A)—which includes the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment—from the list of factors courts may consider.

---

[1] *See U.S. Sentencing Comm'n, Compassionate Release: The Impact of the First Step Act and COVID-19 Pandemic*, at 61 (Mar. 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220310_compassionate-release.pdf.

Courts have discretion to grant early termination of supervised release when an individual has demonstrated rehabilitation and continued supervision no longer serves a necessary purpose. In United States v. Farineau, No. 3:23-cr-60 (SRU) (D. Conn. Oct. 25, 2024), the court terminated a defendant's lifetime supervised release after six years, despite government opposition. The court emphasized that supervised release is not a punishment but a rehabilitative tool, and once its rehabilitative purpose has been accomplished, continuing it serves no meaningful purpose. The court further noted that prolonged supervision could actually hinder opportunities for further reintegration.

The reasoning in Farineau aligns with well-established principles from *Johnson v. United States*, 529 U.S. 53, 59 (2000), which reaffirmed that supervised release is not intended as additional punishment but as a transitional tool. Accordingly, Defendant respectfully requests that this Court consider similar factors in evaluating the necessity of continued supervision.

Additionally, in United States v. Lester, No. 23-2176 (8th Cir. 2024), the Eighth Circuit clarified that even individuals subject to a mandatory minimum term of supervised release are eligible to seek early termination under § 3583(e)(1) after just one year. Courts within this district have exercised their discretion under § 3583(e)(1) to terminate supervised release for sex offenders. See *United States v. Freeman*, Case No. 6:20-cr-60035 (W.D. Ark. 2023).

On January 24, 2025, the United States Sentencing Commission released proposed amendments to the Federal Sentencing Guidelines[2], which would eliminate the presumption of lifetime supervised release for sex offenses and instead require judges to justify the length of supervision imposed. These amendments also emphasize judicial discretion in reviewing motions for early termination and encourage individualized assessments rather than blanket policies regarding supervised release duration.

---

[2] *See U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines, at 6 (Jan. 24, 2025),* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20250130_rf-proposed.pdf.

The Commission's revisions reflect a growing recognition that supervised release should serve a rehabilitative function and should not be extended when it is no longer necessary for public safety. Courts are now encouraged to evaluate whether continued supervision serves an actual purpose and terminate supervision for those who have demonstrated compliance and rehabilitation.

Defendant's case aligns with these new policy recommendations, as he has fully complied with all conditions of supervision for over four years, completed treatment with a low risk of recidivism, maintained stable employment, and reintegrated into society. Given that the Sentencing Commission now discourages default lifetime supervision, this Court has further reason to consider early termination under 18 U.S.C. § 3583(e)(1).

Given Defendant's exemplary conduct, lack of violations, and demonstrated reintegration into society, continued supervision is not warranted under the proper legal framework. The controlling precedent in *Lester* confirms that this Court has authority to grant early termination.

### III. RECIDIVISM DATA SUPPORTS EARLY TERMINATION

The U.S. Sentencing Commission's June 2021 report, *Federal Sentencing of Child Pornography Non-Production Offenses[3]*, found that the overall recidivism rate for these offenses is 27.6%, with sexual recidivism at just 4.3%. Furthermore, the median time to first rearrest for any offense was 8 months, and for sexual recidivism, it was 12 months. The Defendant has far exceeded both these timeframes, having had no law enforcement contact or negative reports during supervised release.

---

[3] *See* U.S. Sentencing Comm'n, *Federal Sentencing of Child Pornography Non-Production Offenses*, at 13 (June 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

4

Moreover, the 2023 *Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety*[4] study by the Administrative Office of the U.S. Courts (Thomas H. Cohen) confirmed that individuals granted early termination do not have higher recidivism rates than those serving full terms. In fact, supervisees who received early termination had a lower rearrest rate (10%) compared to those who served their full terms (12%), with violent recidivism rates showing no significant difference. This evidence confirms that continued supervision is unnecessary for individuals who have demonstrated stability and law-abiding behavior.

### IV. SENTENCING DISPARITIES UNDER 18 U.S.C. § 3553(a)(6)

Under 18 U.S.C. § 3553(a)(6), courts must consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. An analysis of recent sentencing data reveals significant disparities in the application of supervised release terms, particularly for cases involving USSG §2G2.2.

According to the declaration by Darren Kramer of SentencingStats.com, during the last five fiscal years (FY2019-2023), there were 4,595 sentencings under criminal history Category I with a lead guideline of §2G2.2, exclusive of 5K1.1 cooperators.[5] Of these defendants:

- 83.6% (3,840) were sentenced to supervised release ranging from 1 to 469 months

- Only 15% (687) were sentenced to supervised release for life

This data places the Defendant's lifetime supervised release sentence in the 85th percentile, marking it as a clear outlier compared to current sentencing practices.

---

[4] *See* Thomas H. Cohen, Admin. Off. of the U.S. Cts., *Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety*, at 19 (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5098803.
[5] *See* Exhibit A-Declaration of Darren Kramer, Chief Executive Officer & Co-Founder, SentencingStats.com, Inc. ¶ 10 (Feb. 20, 2025).

Furthermore, U.S. Sentencing Commission data show a declining trend in lifetime supervised release sentences under USSG §2G2.2 over the past decade. The rate has decreased from 20% in 2014 to 16% in 2023, while the rate of finite supervised release terms (above 0 months and below 470 months) has increased from 79% to 83% during the same period.

The U.S. Sentencing Commission's 2023 Violations Report further underscores the rarity of lifetime supervised release. According to the report, only 1.2% of offenders at original sentencing and 0.7% of supervision violators were sentenced to lifetime supervision.

These statistics highlight that the Defendant's lifetime supervised release sentence is increasingly uncommon and diverges significantly from current sentencing trends. The data suggest that the vast majority of similarly situated defendants receive finite terms of supervised release, raising questions about the proportionality and necessity of the Defendant's lifetime term.

Given these clear disparities and the evolving understanding that indefinite supervision should not be imposed as a default, there is strong justification for reconsidering the necessity of the Defendant's continued supervision. This reconsideration aligns with the growing recognition, as evidenced by recent Sentencing Commission amendments, that supervised release should serve a rehabilitative function rather than an indefinitely punitive one.

### V. EXCLUSION OF RETRIBUTIVE FACTORS

As noted above, Congress deliberately excluded 18 U.S.C. § 3553(a)(2)(A) from consideration under § 3583(e), reinforcing that courts may not base decisions regarding supervised release on the seriousness of the original offense, the need to promote respect for the law, or just punishment. The Supreme Court previously recognized in *Tapia v. United States*, 564 U.S. 319 (2011), that courts may not consider retributive goals when imposing supervised release—a principle equally applicable to its

6

termination. Courts have recognized that the role of supervised release is to assist with reintegration and transition—not to serve as an extended punishment (*Johnson v. United States*, 529 U.S. 694 (2000)).

In Defendant's case, continued supervision serves no rehabilitative or public safety purpose. Since being granted compassionate release—a rare event, as Defendant was the only individual in the district to receive such relief due to Covid-19—Defendant has remained fully compliant, completed sex offender treatment, obtained stable employment, and contributed positively to the community.

Accordingly, as Congress intended and supported by legal precedent, Defendant's compliance and demonstrated rehabilitation warrant early termination of supervised release.

## VI. ACCOMPLISHMENTS AND REHABILITATION

Defendant has taken significant steps to rehabilitate and reintegrate into society, exceeding the standard expectations of supervised release. In addition to full compliance with all conditions for over four years, Defendant has actively pursued educational, financial, psychological, and personal development programs to ensure long-term stability and success.

During his incarceration, this commitment to rehabilitation and self-improvement was already evident. He successfully completed thousands of hours of programming[6], participated in a canine rehabilitation training program, and earned an associate's degree through correspondence courses. He was also entrusted with one of the most secure positions in the institution directly by the Warden, an assignment that required responsibility and discipline.

Attached as exhibits – Certificates of Rehabilitation and Educational Achievement is a collection of certificates of completion for programs that Defendant successfully participated in, including:

- Sex offender treatment and aftercare programs, which assessed Defendant as low risk of recidivism.

---

[6] *See* Docket Entry No. 51 at 11–14, *United States v. Stone*, No. 2:09-cr-20074 (W.D. Ark. 2020).

- Anger management, commitment to change, and drug education programs, demonstrating cognitive and behavioral rehabilitation.
- Educational achievements, including an Associate's degree in General Business and a Bachelor's degree in Business Administration from the University of Arkansas.
- Personal and financial development courses, such as John C. Maxwell's *The 15 Invaluable Laws of Growth* and Dave Ramsey's *Financial Peace University*.
- Volunteer work and community engagement, including participation in a canine skills training program as a foster puppy raiser.

These certifications collectively illustrate Defendant's exceptional rehabilitative progress, commitment to self-improvement, and active reintegration into the community. They provide compelling evidence that continued supervision is no longer necessary under 18 U.S.C. § 3583(e)(1) and that early termination is in the interest of justice.

Defendant's commitment to rehabilitation was evident from the moment he was released from custody. At the time of his release in June 2020, the COVID-19 pandemic had caused significant disruptions in court-mandated treatment programs, and the courts were withholding treatment requirements due to safety concerns. Despite not being required to enroll immediately, Defendant took the initiative to seek out a treatment provider on his own. The provider he found later became the federally contracted treatment provider for the district, confirming that Defendant's choice met all necessary standards.

Defendant enrolled in weekly individual therapy sessions during his first year of supervised release, adjusting to monthly group sessions in his second year as he progressed through the program. His proactive approach, full participation, and ultimate successful completion of treatment reflect his commitment to rehabilitation and further reinforce that continued supervision is unnecessary.

Another significant milestone in Defendant's reintegration is his ability to maintain a healthy and stable relationship for nearly four years. A primary objective of sex offender treatment is the development of healthy interpersonal relationships, and Defendant has successfully demonstrated this by maintaining a committed relationship with his girlfriend for nearly four years. This further affirms that Defendant has applied the principles learned in treatment and has continued to make positive personal and emotional

8

growth. His ability to build and sustain a meaningful relationship underscores his rehabilitation and ability to function in society without the need for continued supervision.

Since his release, the Defendant has continued his rehabilitation and reintegration efforts. He has maintained stable employment for over four years, even earning promotions. Furthermore, he founded and operates a business providing website and graphic design services, contributing to economic growth, and demonstrating financial independence. He also completed a Bachelor of Science degree in Supply Chain Management, furthering his professional development.

Beyond his personal growth, the Defendant has actively contributed to his community. He helped start a religious-based 12-step program for overcoming addiction through his church, providing support and guidance to individuals seeking recovery. Additionally, he launched a podcast titled *Beyond the Walls: The Next Chapter*, dedicated to assisting individuals reentering society after incarceration. This initiative provides resources and guidance on employment, financial management, legal rights, and community reintegration, further highlighting his commitment to supporting others on similar journeys.

One of the most fundamental aspects of reintegration into society is the ability to fully participate in civic life, including the right to vote. Defendant's continued supervision prevents him from exercising this core democratic right.

The Supreme Court has long recognized voting as a fundamental right essential to full citizenship (*Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). In Arkansas, individuals on supervised release remain ineligible to vote, regardless of their rehabilitation or law-abiding conduct.

Thus, early termination is the only avenue through which Defendant can regain his voting rights and fully demonstrate his commitment to civic responsibility. Allowing Defendant to regain this right is in the interest of justice, as it will further cement his positive reintegration, personal responsibility, and

9

community engagement—all core objectives of supervised release. Given his exemplary post-release record, there is no justification for continued disenfranchisement.

Defendant has also demonstrated financial responsibility and full accountability for all court-ordered obligations. Notably, Defendant paid off all fines and fees related to this case nearly a decade ago—while still incarcerated. Despite having limited financial resources at the time, Defendant prioritized fulfilling his financial obligations, further reflecting his commitment to rehabilitation and responsibility.

## VII. SUPERVISED RELEASE AS A TRANSITIONAL TOOL

The Supreme Court in *Johnson v. United States*, 529 U.S. 694 (2000), underscored that supervised release is a tool for "improving the odds of a successful transition from prison to liberty" rather than an extension of punishment. The Defendant's successful reintegration—demonstrated through stable employment, higher education, and community contributions—proves that continued supervision serves no rehabilitative or public safety purpose.

## VIII. PUBLIC SAFETY CONSIDERATIONS

The sentencing judge did not mark 18 U.S.C. § 3553(a)(2)(C)—which considers the need to protect the public—on the Statement of Reasons, indicating that public safety was not a significant factor in imposing the supervised release term. This further supports Defendant's request under 18 U.S.C. § 3583(e)(1).

Additionally, judicially recognized standards for early termination presume eligibility for supervisees with at least 42 months of supervision and no violations (Baber & Johnson, 2013)[7]. The Defendant meets and exceeds these criteria, confirming that continued supervision is unnecessary.

---

[7] *See* William H. Baber & Paul J. Johnson, Admin. Off. of the U.S. Cts., *Early Termination of Supervision: No Compromise to Community Safety*, at 1 (2013), https://www.uscourts.gov/sites/default/files/77_2_2_0.pdf.

Even if this Court grants early termination of supervised release, the Defendant will remain subject to significant restrictions and ongoing monitoring. He is required to register as a sex offender for at least ten more years, which includes periodic reporting requirements, potential travel restrictions, and continued scrutiny by law enforcement. This registration requirement ensures that the Defendant remains under the watchful eye of the authorities and provides an additional layer of public safety, even without the direct supervision of a probation officer.

Defendant has also been routinely granted travel permissions throughout his supervised release. Over the past several years, he has been allowed to travel to four different states without issue, and he is regularly permitted to leave the district without incident. These approvals reflect Probation's confidence in Defendant's compliance and low risk of reoffending.

However, the continued requirement to seek approval for every trip has become an unnecessary administrative burden—both for Defendant and his probation officer. Given Defendant's long track record of responsible behavior and accountability, requiring frequent permission requests serves no rehabilitative or supervisory purpose and only creates unnecessary red tape. The ability to travel freely is another factor supporting the termination of supervised release.

Courts have recognized that continuing supervision when it no longer serves a rehabilitative or public safety purpose is counterproductive. In *United States v. Farineau*, No. 3:23-cr-60 (SRU) (D. Conn. Oct. 25, 2024), the court ruled that continued supervision was unnecessary, emphasizing that the defendant's full compliance, successful treatment completion, stable employment, and lack of violations all demonstrated rehabilitation. The Farineau court rejected the government's argument that the seriousness of the offense alone warranted continued supervision, instead focusing on the defendant's post-release conduct. Similarly, Defendant has fully complied with all conditions of release, demonstrated

11

successful reintegration, and remains subject to sex offender registration for at least 10 more years, which ensures continued public safety even if supervised release is terminated.

The United States Sentencing Commission's 2025 proposed amendments emphasize that supervised release should not be indefinite or punitive but rather should serve a rehabilitative function. The Commission now explicitly states that courts should reconsider the necessity of continued supervision on a case-by-case basis and terminate supervision when it no longer serves a meaningful purpose.

Defendant meets all criteria that the Sentencing Commission now recommends for early termination:

- Full compliance with supervised release conditions for over four years.
- Completion of all court-ordered treatment programs.
- Demonstrated reintegration into society through stable employment and community engagement.
- No new offenses or violations.

Since Defendant remains subject to sex offender registration laws, which will continue to provide monitoring, further supervised release adds no additional public safety benefit. The new Sentencing Commission guidance affirms that continued supervision in such cases is not necessary and should be discontinued under 18 U.S.C. § 3583(e)(1).

Additionally, the continued supervision of the Defendant is an inefficient use of government resources. The Defendant's probation officer must travel ninety miles round trip for a brief 5-minute visit, which is only required every 2-3 months. Given the Defendant's long history of compliance, low risk of recidivism, and demonstrated stability, these resources could be better allocated to supervise individuals who present a higher need for monitoring. The cost and time associated with these visits further highlight the lack of necessity for continued supervision in this case.

**IX. REMORSE**

The Defendant understands the gravity of the offense for which he was convicted and takes full responsibility for his actions. He is deeply remorseful for the harm he caused to the victims and is committed to living a life that reflects his sincere regret. He has dedicated himself to rehabilitation and positive change, and he is determined to continue on this path.

## X. CONCLUSION

The United States Sentencing Commission's 2025 proposed amendments explicitly recognize that lifetime supervision should not be the default for sex offenses and that courts should now justify supervision length. Given that the Sentencing Commission now discourages unnecessary supervision and proposes individualized assessments, Defendant's case presents a clear and compelling justification for early termination under 18 U.S.C. § 3583(e)(1).

Moreover, the U.S. Probation Office has taken no position on this request, neither supporting nor opposing early termination. Defendant has demonstrated full compliance, completed all required treatment, and successfully reintegrated into society. The factors under 18 U.S.C. § 3583(e)(1) weigh in favor of early termination, and continued supervision should be evaluated based on its current rehabilitative and public safety purpose.

As courts have recognized in cases like United States v. Farineau, once the rehabilitative purpose of supervised release has been fully achieved, continued supervision is no longer necessary and may even hinder further reintegration. Given Defendant's full compliance, professional success, and demonstrated rehabilitation, Defendant respectfully requests that this Court grant early termination of supervised release under 18 U.S.C. § 3583(e)(1).

Respectfully submitted this **11th** day of ____March____, 2025,

Jacob Logan Stone, Pro Se
6633 Leisure Loop
Ozark, AR 72949
JacobLStone1@gmail.com
(479) 209-1707

**Certificate of Service**

I hereby certify that on this 11th day of _March_, 2025, a true and correct copy of the foregoing

**Motion for Early Termination of Supervised Release** was served upon the following parties by U.S. Mail:

- United States Attorney
  414 Parker Avenue
  Fort Smith, AR 72901

- U.S. Probation Office
  *Sent via e-mail*

Respectfully submitted,

Jacob Logan Stone, Pro Se
6633 Leisure Loop
Ozark, AR 72949
JacobLStone1@gmail.com
(479) 209-1707

EXHIBIT LIST

A ....... Declaration of Darren Kramer, CEO and Co-Founder of SentencingStats.com

B ....... Certificates of Completion of sex offender treatment programs showing low risk of reoffending

C ....... Letter of support from David Webb (Employer)

D ....... Letter of support from Marilyn Stone (Mother)

E ....... Letter of support from Mindy Carr (Significant Other)

F ....... Certificate of Completion of Associate's Degree

G ....... Certificate of Completion of Bachelor's Degree

H ....... Certificates of Completion of personal and professional development programs

# EXHIBIT

# A



the source for sentencing data and analysis

February 20, 2025

**Declaration of Darren Kramer,
Chief Executive Officer & Co-Founder,
SentencingStats.com, Inc.**

I, Darren Kramer, having personal knowledge of the matters set forth below, do declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Chief Executive Officer and Co-Founder of SentencingStats.com, Inc. ("SSINC"), a research firm that provides statistical analysis of U.S. Sentencing Commission sentencing data and other pertinent data to legal professionals across the country. Co-founded by former U.S. Sentencing Commission attorney Mark Allenbaugh, the company employs a number of data scientists and data analysts who ensure the sentencing data and analytics produced by SSINC utilize best practices in data science and are highly relevant to USSC Policy.

Jacob Stone
Supervised Release Data Analyses                    Page **2** of **10**
February 20, 2025

2.    SSINC was retained by the Defendant, with regard to the
matter of *USA v.* Jacob Stone, 2:09-cr-20074 (Arkansas,
Western   District),   to   analyze   the   U.S.   Sentencing
Commission's publicly available datafiles[1] for similarly
situated defendants matching various sentencing scenarios
identified further below.

3.    SSINC   utilized   the   SPSS   version   of   the   Commission's
datafiles,   which   contain   sentencing   data   on   331,932
individuals sentenced under the U.S. Sentencing Guidelines
from fiscal years 2019 through and including 2023, the latest
datafile currently available.

4.    Each individual sentence reported in the datafiles is
assigned   hundreds   of   variables   reporting   a   variety   of
relevant data points including the actual sentence imposed,

---

[1] The Commission's public datafiles are available at https://www.ussc.gov/research/
datafiles/commission-datafiles. SSINC utilizes the SPSS version of the datafiles. Courts may independently run
limited statistical analyses of the same data, but only back to FY 2017. *See* U.S. Sentencing Comm'n, *Judiciary
Sentencing Information*, at https://www.ussc.gov/guidelines/judiciary-sentencing-information.

Jacob Stone
Supervised Release Data Analyses                  Page **3** of **10**
February 20, 2025

the final applicable sentencing guideline and advisory range
as determined by the court, the final (i.e., total) offense
level, the criminal history category including criminal
history points, the length of supervised release imposed, and
whether the sentence was the result of a government motion
for a departure or a court-initiated variance, among many
other factors. Also reported are the defendant's age, race,
ethnicity, sex, citizenship, and educational level. Notably,
no case identifiers are reported such as the name of the
defendant or the identity of the sentencing judge.

5.  All the variables reported in the datafiles are defined
in the U.S. Sentencing Commission's Variable Codebook for
Individual Offenders (1999-2023) (revised April 25, 2024).[2]
The relevant variables SSINC generally utilizes and analyzes
are listed and defined in the appendix below, although not
all may have been utilized for the instant analyses. Some of
the variables are proprietary to SSINC and are indicated by

---

[2] The Codebook is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/datafiles/USSC_Public_Release_Codebook_FY99_FY22.pdf.

Jacob Stone
Supervised Release Data Analyses                    Page **4** of **10**
February 20, 2025


italics, meaning they are variables generated by SSINC based on data otherwise contained within the Commission's datafiles.

### Statistical Analyses of Sentencing Data

6.  On July 16, 2010, Mr. Stone was sentenced to 150 months of imprisonment by Honorable Robert T. Dawson. The sentence imposed notably fell below the advisory guidelines. Judge Dawson cited in his reasons for a variance factors including Mr. Stone's young age, the likelihood he could get treatment his concern that "the Guidelines are stated to be in excess of even what the Congress has authorized for the maximum penalties in the matter."

7.  On June 23, 2020, Mr. Stone concluded his sentence of imprisonment and began his supervised release. Since that time, he has maintained steady employment and has an unblemished record.

8. Per the Judgment, Mr. Stone was imposed a lifetime sentence of Supervised release, with a Total Offense Level of 37 (inclusive of acceptance of responsibility) in Criminal

Jacob Stone
Supervised Release Data Analyses                    Page **5** of **10**
February 20, 2025


History Category of I.


9.   SSINC performed an analysis on the Commission's datafiles
and found during the last five fiscal years (FY2019-2023),
there were 295,481 sentencings, across all criminal history
categories, offense levels and exclusive of 5K1.1
cooperators. Of these, only 2,880 defendants were sentenced
to supervised release for life.  This equates to a rate of
0.98%. The average supervised release imposed was 35 months,
and the median, 36 months.


10. Moreover, during the last five fiscal years (FY2019-
2023), there were 4,595 sentencings under criminal history
Category I, with a lead guideline of 2G2.2, exclusive of 5K1.1
cooperators. 3,840 of these defendants (83.6%) were sentenced
to supervised release at a range of 1 through and including
469 months, while only 687 (15%) were sentenced to supervised
release for life. This places Mr. Stone in the 85th percentile.
The average supervised release for this segment was 183
months, and the median 120 months.

Jacob Stone
Supervised Release Data Analyses                    Page **6** of **10**
February 20, 2025

11. U.S. Sentencing Commission data show that over the past
ten fiscal years, the rate of defendants sentenced to
supervised release for life under USSG §2G2.2 has declined
4%, from 20% in 2014 to 16% in 2023. Conversely, the rate of
sentences of supervised release falling above 0 months and
below 470 months has increased 4%, from 79% in 2014 to 83% in
2023. The trend chart below (fig. 1) illustrates the rate of
lifetime supervised release sentences compared to the rate of
supervised release sentences above 0 months and below 470
months (exclusive of sentences imposed pursuant to USSG
§5K1.1) for all sentences imposed pursuant to USSG §2G2.2
over the last ten fiscal years. As shown, barely half of all
those sentenced under USSG §2G2.2 received a within-range
sentence.



Jacob Stone
Supervised Release Data Analyses                    Page **7** of **10**
February 20, 2025

12. In conclusion, the statistical evidence clearly
demonstrates that Mr. Stone's lifetime supervised release is
a marked outlier compared to current sentencing practices.
The data reveal that an overwhelming majority—nearly 84%—of
similarly situated defendants receive a finite term of
supervised release ranging from 1 to 469 months, while
lifetime sentences are rendered in only about 15% of cases in
sentences imposed pursuant to USSG §2G2.2 and within criminal
history category I. Moreover, the gradual decline in lifetime
supervised release sentences over the past decade underscores
that such a measure is increasingly rare. This stark
divergence from prevailing trends not only places Mr. Stone
in a distinct minority but also raises significant questions
regarding the proportionality of his sentence.

I declare under penalty of perjury under the laws of the
United States of America that the foregoing is true and
correct.

Executed on February 20, 2024

_____
Darren Kramer,
Chief Executive Officer & Co-Founder
SentencingStats.com, Inc.

Jacob Stone
Supervised Release Data Analyses                                    Page **8** of **10**
February 20, 2025

## Appendix A

| Variable | Definition | Note |
|---|---|---|
| *Year* | Datafile in which sentence was found. | For example, if variable reports 2008, the sentence was found in the U.S. Sentencing Commission's datafile for fiscal year 2008. |
| *Guideline* (GDLINEHI) | Final sentencing guideline utilized after all grouping performed. | |
| DISTRICT | The federal district where the sentence was imposed. | |
| STATMAX | The total statutory maximum term of imprisonment for all counts of conviction. | |
| STATMIN | The statutory minimum term of imprisonment for all counts of conviction. | If there was no applicable minimum, the value is 0. |
| FIREMIN | The statutory minimum term of imprisonment due to a 924(c) conviction. | |
| GLMIN | The bottom of the applicable guidelines sentencing range in months. | |
| GLMAX | The top of the applicable guidelines sentencing range in months. | |
| CRIMHIST | Whether the defendant had any criminal history. | 1 means some criminal history including criminal history that otherwise may not be scoreable. 0 means none. |

Jacob Stone
Supervised Release Data Analyses                    Page **9** of 10
February 20, 2025

| USSCIDN | The unique serial number assigned to this defendant by the U.S. Sentencing Commission. | |
|---------|----------------------------------------------------------------------------------------|--|
| CRIMPTS | The total number of criminal history points determined by the Court. | Not to be confused with the criminal history category. |
| DISPOSIT | The manner of conviction (disposition) whether by trial or plea. | 1 means plea. 2 means nolo contendere. 3 means jury trial. 4 means bench trial. |
| BOOKERCD[3] | Determines whether and nature of any departure or variance. | 0 = Within Range<br>1 = Upward Departure<br>2 = Upward Departure w/Booker<br>3 = Above Range w/Booker<br>4 = Remaining Above Range<br>5 = 5K1.1/Substantial Assistance<br>6 = Early Disposition/5K3.1<br>7 = Government Sponsored - Below Range<br>8 = Downward Departure<br>9 = Downward Departure w/Booker<br>10 = Below Range w/Booker<br>11 = Remaining Below Range |
| SENTYR | Calendar year sentence was imposed. | |
| NWSTAT1-NWSTAT5 | The offenses of conviction. | |
| XFOLSOR | The final (or total) offense level as found by the Court. | |
| XCRHISSR | The final criminal history category as found by the Court | |
| SUPREL | Number of months of supervised release ordered | |
| AMENDYR | The version of the | |

---

[3] The Commission renamed this variable to SENTRNGE in FY 2018 and changed the values. For consistency purposes and to allow for comparison to earlier fiscal years' datafiles, SSINC has recreated this variable by translating the new values reported at SENTRNGE to old values reported at BOOKERCD. Some minor fidelity in the data necessarily was reduced as a result.

Jacob Stone
Supervised Release Data Analyses                Page **10** of **10**
February 20, 2025

| | Guidelines Manual applied by the Court as identified by its year of publication. | |
|---|---|---|
| DSPLEA | The type of disposition, i.e., specific manner of conviction. | 0 = Not Received<br>1 = Received<br>2 = Received Alternate Document<br>3 = Oral Plea Agreement<br>5 = Straight up Plea, No Agreement<br>8 = Trial<br>9 = Guilty Plea, Type Indeterminable |
| MWEIGHT | The marijuana weight equivalency, in grams, of all the drug types coded. | |

# EXHIBIT

# B

# CERTIFICATE OF *COMPLETION*

MT. HOPE COUNSELING CENTERS, INC.

## Jacob Stone

HAS SUCCESSFULLY COMPLETED THE

### SEX OFFENDER SPECIFIC PROGRAM

This Individual is considered at low risk for recidivism at time of completion

SEPTEMBER 9
2021

*Stephen D. Chiovoloni*, DSW, LCSW, LADAC, AADC, CCDP, CGP

*Stephen D. Chiovoloni*, Owner/Director

MT HOPE COUNSELING
CENTERS, INC



# CERTIFICATE *of* COMPLETION

MT. HOPE COUNSELING CENTERS, INC.

## Jacob Stone

HAS SUCCESSFULLY COMPLETED THE

### Sex Offender Aftercare Program

AUGUST 22
2022

**Stephen D. Chiovoloni DSW**

STEPHEN CHIOVOLONI DSW, LCSW, LADAC, AADC, CCDP,

# EXHIBIT

# C

February 17, 2025

To the Honorable Judge of the United States District:

This letter is in support of Jacob Stone's motion for early termination of supervised release. My name is David Webb, and I am a partner at A Plus Extrusion, where Jacob has been employed since November 2020. Over the past four years, I have had the opportunity to observe Jacob's strong work ethic, professional growth, and commitment to personal and professional development.

Since joining our team, Jacob has consistently demonstrated reliability, dedication, and leadership in his role. He has received multiple promotions due to his hard work, attention to detail, and ability to take on greater responsibilities. Currently, he is one of our senior employees, trusted with critical tasks that require strong problem-solving skills and independent judgment. His ability to mentor and assist newer employees has further reinforced his value to our organization.

Jacob has not only proven himself as an excellent employee but also as a responsible and trustworthy individual. He is respected among his colleagues and has shown a commitment to professional integrity and continuous self-improvement. Throughout his employment, he has been dependable, met all job expectations, and works unsupervised in many of his job duties. I believe these attributes allow Jacob to remain a productive member of society.

In my professional opinion, Jacob's conduct as an employee combined with his work history clearly demonstrate that he has fully reintegrated into society. His success in the workplace and his ability to maintain steady employment and advance his career, reflects his rehabilitation and dedication to moving forward in life.

Thank you for your time and consideration of this request. If the Court requires any additional information, I would be happy to provide further details regarding Jacob's employment and character.

Sincerely,

David S. Webb
A Plus Extrusion
1532 Construction Way
Van Buren, AR 72956
(479) 262-2539

# EXHIBIT

# D

My name is Marilyn Stone. I am Jacob Stone's mother. I am a 73 year old retired reading teacher. Jacob was adopted by our family when he was three days old. I am writing this letter to strongly support the early termination of Jacob's supervised release.

Jacob returned home to live with me on June 23, 2020, upon his release. Since he has been home, he has demonstrated responsibility, integrity, and rehabilitation. I have witnessed Jacob demonstrate responsibility as he held a full time job, while completing his BS degree in Supply Chain Management. This took a lot of "burning the midnight oil" and determination from him. He was committed to earning that degree to qualify for better employment.

I have observed integrity in Jacob as he pursued **above** the required amount of counseling. He worked with strong resolve to determine how he could "recover" from the bad choices he had made. He sought with all his being to understand the magnitude of what he had done and why, as well as how to make some restitution for it.

He volunteered for a religious program, "Time 2 Heal" and sought forgiveness and repentance by verbally sharing his story with the program members. He also sought to help in the program by mentoring others.

He pursued rehabilitation by focusing his life on the needs of others, such as his efforts to take care of activities that are now difficult for me. During my knee disability, he served as my driver, my shopper, my heavy lifter, as well as helping with chores around the house that I could not do. He did these jobs voluntarily and with a heart of love – never complaining. I have also witnessed his endless giving of help for his girlfriend – moving her twice, being sure she could visit her parents, as well as helping clean her apartment and shopping for her needs.

Before his arrest, he never seemed conscious of the needs of others. Life was mostly about him. He had anger issues that have all vanished since he has been home. I would say his personal growth has been in recognizing the needs of others and gaining control of himself, plus showing no resentment towards his past, his present, or his future (as he seeks to make it better).

Jacob returned home with a resolve to never return to prison again. He predetermined that he would comply with each and every supervised release condition. I have been amazed at his scheduling, his notes, his calendars and all the paperwork and emails he's put in place to keep up with all his required reporting.

I strongly believe Jacob has established firm behaviors in his life that will help keep him on the right path. He's not only done the "paperwork", but I've observed that he's etched these

behaviors into his mind and heart. I've witnessed true remorse and repentance through his actions as well as in hearing them in deep conversations we've shared.

I believe continued supervision has become just a formality and that he has accomplished true self supervision by reintegrating himself successfully into a world that meets his desires, hopes, and dreams.

Thank you for your time, your consideration, and your sense of equity and justice.

Respectfully,

Marilyn Stone

# EXHIBIT

# E

**RE: Support for Early Termination of Supervised Release – Jacob Stone**

Hello Judge,

I am writing this letter in support of my boyfriend, Jacob Stone, and his request for early termination of supervised release. We have been in a committed relationship since May 2021, and in that time, I have seen firsthand how much he has grown and the responsible, kind, and hardworking person he is today.

One of the things I appreciate most about Jacob is his consistency. Every week, we do our grocery shopping together—something that may seem small but reflects the kind of stable and supportive partnership we have built. These simple moments show me how much he values routine, responsibility, and planning for the future. We have spent a lot of time discussing our goals and dreams, and he is always thinking ahead, making sure that he is building a life that is both stable and meaningful.

Beyond our day-to-day life, we have taken several trips out of state together, and not once has there ever been a concern for public safety. Whether traveling for work or simply to spend time together, he has always conducted himself with integrity, respect, and responsibility. These trips have only reinforced my belief that he is fully capable of managing his life without the need for continued supervision.

I also know that one of the main goals of treatment is learning how to build and maintain healthy relationships, and I can confidently say that Jacob has done exactly that. He applies what he has learned to our relationship and to the people around him. He communicates openly, listens, and genuinely cares about the well-being of others.

More than anything, I have seen him work tirelessly to create a positive future for himself—through his career, his business, and the way he supports those around him. He has done everything asked of him and more, proving that he is fully capable of leading a responsible, law-abiding life.

I truly believe he has outgrown the need for supervision, not because it is inconvenient, but because it is no longer necessary. He has shown through his actions that he is committed to his future, to his community, and to being the best version of himself. I ask that you strongly consider granting his request for early termination, as he has already demonstrated that he is ready for this next step.

Thank you for your time and consideration.

Sincerely,

Mindy Carr

# EXHIBIT

# F



# Adams State University

The Board of Trustees for Adams State University

upon recommendation of the faculty of Adams State University

hereby confer upon

## Jacob Logan Stone

the degree of

## Associate of Arts/General Business

with all the rights, responsibilities, privileges and honors thereunto appertaining.

Conferred at Alamosa, Colorado, this fourteenth day of May, two thousand sixteen.



_____
President of the College

_____
Chairman of the Board of Trustees

# EXHIBIT

# G



# University of Arkansas

To all to whom these presents may come



## Greeting

Be it known that

### Jacob Logan Stone

*has successfully completed the prescribed course of study*
*for the degree of*

# Bachelor of Science in Business Administration

*Upon the recommendation of the Faculty, with the approval of the Board of*
*Trustees, and as evidence that all requirements for the degree have been*
*fulfilled, this diploma is granted by the University of Arkansas*
*in the city of Fayetteville on this 14th day of May, 2024*

CHAIR BOARD OF TRUSTEES      PRESIDENT OF THE UNIVERSITY      CHANCELLOR

# EXHIBIT

# H



# *Certificate of Completion*

## U.S. Medical Center for Federal Prisoners
## Springfield, Missouri

*This certifies that:*

## *Jacob Stone (09849-010)*

*has satisfactorily completed*

## *Anger Management*

*and is hereby awarded this certificate, the 25th day of October, 2018.*

J. Engel, Psy.D., DAPC



# Sexual Assault Prevention for Undergraduates

THIS CERTIFIES THAT

**Jacob Stone**

completed the following course:

Sexual Assault Prevention for Undergraduates

University of Arkansas, Fayetteville

AWARDED BY 

# Certificate Of Completion



## Responding To The Truth
## Recovery through Jesus



This certificate is awarded to ___Jacob Stone___ for completion of the 12 Steps of Responding Recovery and faithful attendance to the class sessions.

"Time 2 Heal" is a ministry of "Time To Stand Church of the Nazarene" located at 2205 West Main Street in Clarksville, AR 72830.

Presented this day October 29th in the year of our Lord 2022.

Senior Pastor _Rev. Glen Newton_

Associate Pastor _Rev Ron Newton_

# Certificate Of Completion

### JACOB STONE

Completed the Practical and Accountability Requirements of

## Dave Ramsey's

# Financial Peace
### UNIVERSITY

Personal finance is 80% BEHAVIOR and only 20% HEAD KNOWLEDGE.
By continuing to apply the principles you have been taught,
you will permanently change your life!
It's up to YOU to live and walk in FINANCIAL PEACE.

Coordinator: *Chaplain R. Haverhals*

Date Completed: *March 31, 2016*



# CERTIFICATE OF COMPLETION

IS HEREBY PRESENTED TO

## Stone



To certify that he has successfully completed the

*Commitment to Change*

Given this 24th day of February, 2016
FCI II Oakdale, LA

R. D. Weeks, Associate Warden (Programs)




# Certificate

## *OF AWARD*

May it be known by all who read this that a Certificate
of Award has been presented to

*Jacob Stone*

*For Outstanding Achievement & Accomplishment in*

## Drug Education

*Presented this 20th Day of March, 2012*

B. L. Smith, M.S., L.P.C.





# CERTFICATE OF COMPLETION

is present to

## *Jacob Stone*

For

## PSYCHOLOGICAL RE-ENTRY GROUP

Program Therapist
Dr. Alexander

5/10/12

Date

# CARES, Inc.
# Foster Puppy Raiser

In appreciation for exemplary dedication and hard work, we recognize __Mr. Stone___ ___Lager__ has successfully completed the advanced skills training & has been placed as a CARES, Inc. canine assistant.



CARES, Inc. *Sarah Holbert*

October 19, 2018

# *Certificate of Completion*

## U.S. Medical Center for Federal Prisoners
## Springfield, Missouri

*This certifies that:*

## *Jacob Stone (09849-010)*

*has satisfactorily completed*

## *Criminal Thinking*

*and is hereby awarded this certificate, the 14th day of January, 2019.*

J. Engel, Psy.D., DAPC

# Certificate of Completion

"Motivation gets you going, discipline keeps you growing."
John C. Maxwell

This certificate is awarded to

## Jacob Stone

For successfully participating in the group:
**John C. Maxwell's**
*The 15 Invaluable Laws of Growth*

Ms. Landrigan, Reentry Affairs Coordinator

12/18/2017
Date

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED



**PRIORITY**® MAIL

ed delivery date specified for domestic use.

ic shipments include $100 of insurance (restrictions apply).*

racking® service included for domestic and many international destinations.

international insurance.**

sed internationally, a customs declaration form is required.

oes not cover certain items. For details regarding claims exclusions see the
ail Manual at *http://pe.usps.com.*

ational Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

**T RATE ENVELOPE**
E ■ ANY WEIGHT

**CKED ■ INSURED**


300001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP


PAPER
POUCH



US POSTAGE & FEES PAID IMI          063S0002798188
2 LB PRIORITY MAIL RATE                    19857838
ZONE 1 NO SURCHARGE                    FROM 72949
Commercial                                    ☐ Stamps
                                                          03/11/2026

## USPS PRIORITY MAIL ®

Jacob Stone                                        **0003**
6633 LEISURE LOOP
OZARK AR 72949-9875

 SHIP TO:     United States District Court
                     Office of the Clerk
                     30 S 6th St Ste 1038
                     Fort Smith AR 72901-2437

**USPS TRACKING #**



9405 5118 9956 0390 1325 89



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.